v. WREI, and Laura Woodruff v. Jonathan Curtis-Brown. Here first from Sidney Powell. Good morning, please, the Court. Sidney Powell for the TriMax Appellants. I think this is the first time in my four decades of practice now before the Court I've started with an argument that we're not supposed to be here. I don't believe this Court has jurisdiction, subject matter jurisdiction, because the claim was either foreclosed by Daystar, the only federal claim was foreclosed by Daystar, or the claim is so patently frivolous that it does not give this Court or the District Court federal jurisdiction over it. The District Judge didn't realize until the day before trial that there was no jurisdiction in this case, yet the plaintiffs sought to bring a Lanham Act claim. Their theory is that it protects unique identifiers, but of course there's nothing in the statutory language that does that, and there's nothing in the jurisprudence of any court that does that. And in fact, there was nothing unique about it at all. They're talking about a number, 60680, not Chanel number 5, and they're talking about a domain name that's as generic as it is, the Honko, for which the Patent and Trademark Office specifically denied trademark protection. So there's simply . . . But isn't there evidence that those fairly general identifiers were recognized in the industry as representing the other party? I'm sorry, Your Honor. I didn't understand. What I thought was, you know, the grommet of this case is that by using those, your client was holding himself out falsely as the opposing party here, and wasn't — isn't there evidence that, in fact, that was the reaction in the marketplace by some who would be doing business with the other party, that this was them doing these things? No, sir. It's not the kind of number that anybody would look at and go, oh, that's WIC fire. There's no brand identification association. Well, but what's the evidence? I thought there was evidence that people confused this as saying this was WIC fire doing this. It was like a billing code embedded deep in the metadata. No, I understood. But you're not responding on the level of evidence, maybe saying there isn't. I thought there was evidence that this was recognized by some — some those who would otherwise be doing business with WIC fire. Well, there's evidence that one merchant with whom WIC fire established no contract or anything like that had given a termination notice based on that, but actually continued to work with WIC fire. So at least that company had recognized one of these two fairly general identifiers as being WIC fire, correct? Yes. But that's not what the Lanham Act addresses at all. There was no verdict on the Lanham Act claim. We're only looking at a verdict on state law claims, correct? Well, the jury found a liability under the Lanham Act, but no damages. The judgment is not based on that. There's no judgment based on the Lanham Act. That's correct. Okay. So the only question is, did the state court have pendant jurisdiction to resolve the state law claims? And it didn't if it didn't have federal subject matter. Well, the question to me is, if there was even a colorable Lanham Act claim, that gets you in the door. You may not, at the end of the day, the judge says it doesn't meet the standards, but it's not so frivolous as to say no jurisdiction, it doesn't seem to me. It is so frivolous as to say there's no jurisdiction, Your Honor. Isn't that the inquiry in front of us? It's either foreclosed by Daystar because they're claiming that it's a false authorship of an ad, a communicative product. Just because the district court rules against you on the merits does not mean it did not have jurisdiction. That's correct. So what is the test for us to decide whether the court had jurisdiction to adjudicate the Lanham Act claim? Because it seems to me if it had jurisdiction to adjudicate the Lanham Act claim, it had jurisdiction to keep the state law claims. That's that. So tell me that your best case, it does not have, it didn't even have jurisdiction to consider whether this was a Lanham Act claim. Exactly. What's the best case? Daystar. Okay. Crowley. This Court's decision in Schlotzky's, which makes plain that 43A extends to trademark infringement, but not to just the world writ large. Was there a 12B1 motion to dismiss based on the pleadings on jurisdiction when that complaint was filed? There was not a motion to dismiss. The test is, to me the test is, you could have gotten a legitimate 12B1 dismiss on jurisdiction on the face of the complaint. Correct. That's your argument? Yes, ma'am. Okay. There is nothing in the complaint that alleges any federally protected interest that's been recognized by any court in the country or in the text of the Lanham Act. Doesn't that depend on the kind of recognition factually that these two alleged marks have obtained? I mean, how do you know from the face of the petition that it doesn't have industry recognition until you get into the facts? It's not about industry recognition. The Lanham Act, it was enacted to protect the consuming public writ large from false advertising and false designations of origin, trademark infringement. They have alleged this case as one of passing off WIC FIRE's products as those of Trimax. Nothing in the ad went to Trimax at all. It was WIC FIRE's merchants, WIC FIRE's code, WIC FIRE's website, and there isn't a case in the country that protects a domain name, which is the coupon code. That's all that is, a domain name, from being linked with anything. In fact, we cited a Ford decision in our brief that makes plain that even if you have a trademarked name and a domain name, people can still link it whether you like it or not. And there's nothing about the number 60680 that triggers public recognition that, oh, that's WIC FIRE. The fact that a few merchants may have only goes to infringement. It doesn't go to the establishment of a mark whatsoever. That's clear from this Court's decision in Amazing Spaces. It would create a whole new genre of trademark law to recognize this as a colorable claim. There just isn't a single precedent for it in any court. It's not, you know, Daystar squarely forecloses the alleged false authorship of any communicative product, which these ads are. So we think, first, it's clearly foreclosed by Daystar. And if ---- Let's talk about Daystar, then. We say that it's privileged. We need to say it seems to me that Daystar leaves, arguably leaves the door open, Justice Scalia, towards I don't know where I am in the opinion. It says the practical difficulty of adopting a special definition of origin for communicative products is, and then he goes into making some examples. But then he says in this case, which you know what it's about, if Daystar had simply copied the series as Crusades in Europe, sold it as Crusades in Europe without changing the title of packaging, which means it's the competitor's name on it, it is hard to have confidence in Respondent's assurance that they would not be here on a Lanham Act cause of action. It seems to me he's at least recognizing that this sort of passing off, false passing off, may well ---- there may be some justification for that under the Lanham Act. How do you interpret, if I haven't spoken too incoherently, that language from the public opinion? This isn't passing off, Your Honor, because it was all WIC fire. The advertisements contained WIC fire's billing code, WIC fire's merchants, WIC fire's domain name. Nothing went to Trimax. No payments went to Trimax. That's what he's talking about here. He's talking about if this TV show about a series or maybe it was a single show about your first broadcast were without changing anything, so it looked like it was coming from the other company, that that may well have led to somebody suing under the Lanham Act. Well, it would have to have somebody else's name on it. Well, that's not the option he's putting out here. Pass off. Well, it is. I mean, what he's saying is the company other than Fox, which is Daystar, if Daystar had simply rebroadcast it, making it look like it was still Fox product and Fox broadcast, I do not have, the Court does not have confidence in Fox's assurance that they would not be here on a Lanham Act cause of action, Daystar's. Daystar's cause of action. But it would have been evident that Daystar was putting it out there. It would have been under Daystar's brand or, you know, Daystar's markings, whereas all of this is WIC fire and WIC fire's markings, WIC fire's billing code. Trimax didn't get any traffic from it, didn't get any money from it. In fact, there's good reason to think it was all WIC fire to begin with. They got hundreds of violation notices with respect to their merchants and were put on Google's list of problems early on anyway. The company had only been inactive a few months when they filed this lawsuit. That's not even long enough to get any sort of trademark protection. My colleagues may have other questions on that, but let me ask you about damages. Why don't you address the way damages were computed and just what evidence there is that would allow us to uphold this damage award? Yes. There is no actual evidence of damages. Texas law requires damages be proved with actual data, facts, figures to a reasonable certainty. In this case, the WIC fire's principles themselves just threw out a claim of 2,000 hours expended with respect to what they called click fraud and other matters in the case. And there was nothing to assign any numerical value to that. I mean, there was no evidence of what their actual income was. There was a trend analysis based on only a few months because they'd only been in business a few months. There's only 10 pages of evidence with respect to their damages at all that doesn't include any sort of document from which this Court could calculate anything. What do you mean 10 pages of evidence? Testimony or something? Testimony of an expert. Okay. Yeah. There are no tax returns in evidence. The district court even said, you know, I'm just not seeing any evidence of damages here. But then, of course, he entered judgment adopting WIC fire's proposed order. Well, I thought WIC fire's theory was that they had some initial income in the early stages of their development as a company, and they extrapolated that for the rest of the time period affected, as they argue, by the actions of your client. Is that how damages were tried to be shown, or is there something else in this case? That's partly it, but they also conflated in their damages calculation income from direct advertisements versus indirect advertisements and overlapped those so that you can't calculate. In fact, they basically threw away their damages for the direct ads because that was not what they were focusing for. They claimed that they were delayed six months in generating their new coupon company business. And, of course, that's a new and speculative business. They had nothing to anchor what that was really worth. And there's simply, there are no timesheets, there are no income tax returns, there is no documentary evidence whatsoever as to anything from which somebody could actually determine damages under Texas law with the reasonable certainty that's required by the cases with respect to any of the damages. The jurisdictional issue, I think, is obviously the most important, because everything else has to be dismissed if the court did not have jurisdiction. And to find this claim colorable under the Lanham Act, which is the most important would require unsupported new law to WIC FIRE's benefit when there is simply no colorable claim there for Lanham Act protection whatsoever. And we've also fully briefed, and I'll rely on that as my time is about to expire, all the elements of the tort claims that also failed. There were no actual contracts between WIC FIRE and any merchants introduced. In fact, counsel said there were over 3,000 such contracts and it wasn't even feasible to produce them, but not a single contract was executed. What they're talking about are the terms and conditions, things that appear on the Internet that no one ever reads. And the merchants continued to do business with WIC FIRE even after the alleged violation notices were received. Bluemax was the only actual violation notice that they put into evidence, and they were still doing business with Bluemax, so there was really no injury or any damages as a result of that either. I'll reserve the remainder of my time for the vote. May it please the Court. Ryan Coy for Appelese. Their showcase issue, what appellants call the most important issue, is jurisdiction. It's also the only federal issue in this case. There are numerous reasons why this Court has jurisdiction. Their theory is that the federal Lanham Act claim was so frivolous that it cannot support appellate jurisdiction or federal jurisdiction at all. That claim survived the motion to dismiss, survived challenge at trial, survived 50A and 50B motions, and actually there was judgment entered, not with any money damages, but in terms of liability on the Lanham Act claim. There was bench briefing on it. There was extensive argument on it. The notion that there wasn't a substantial federal question on the Lanham Act claim is simply wrong. I don't want to spend too much time on this issue because I really do think that it's fairly open and shut jurisdictionally, but the one additional point I will make is Your Honor asked counsel to provide their best case on this issue, and the answer to that had to do with cases regarding the substance of the Lanham Act claim, why they think the I am more than happy to entertain any questions about the substance of the Lanham Act claim, about Daystar, about any of that. But the important cases here are the jurisdictional cases. They cite only one case where this circuit has declined jurisdiction after extensive litigation at the appellate level. That case did not involve any 1367 supplemental jurisdiction issue. The case that they cite, settlement funding LLC v. Rapid Settlements, was a case where it was discovered later at the appellate level that there was no diversity jurisdiction and there was no federal claim at all, so there was no hook to support subject matter jurisdiction. But where there is a federal claim that's been litigated extensively for years in the district court, even if that federal claim is ultimately dismissed by the district court, obviously what didn't happen here, it was never dismissed and there was a jury verdict and judgment on it, it would indeed be an abuse of discretion for the district court to remand the case in light of supplemental jurisdiction. That's the lesson from Brookshire Brothers v. Dayco Products, which cites a number of other cases, including Batiste v. Island Records, Newport v. Sears, Dottie v. Oxy, what the Brookshire court in this circuit called well-established law. When you have a situation like this, years of litigation over a federal claim with supplemental pendent state law claims, it would be an abuse of discretion to remand. Unless the panel has any questions about the federal jurisdictional issue, I'll move on to the damages issue. I'd like to hear about the damages. What's the measure under Texas law and what's your evidence of that? On damages, I would like to address the waiver point, but I'll answer Your Honor's question first. On damages, there's really two core pieces of evidence. What's the Texas law say the measure of damages is? Texas law says the measure of damages is lost. Well, we're seeking a lost profits damages award. To seek a lost profits damages award, you have to establish the fact of some damages, and then you have to establish. How do you establish lost profits? We establish lost profits as follows, and there's really two components to it. There's two claims, interference with existing contracts and interference with prospective contracts. WIC FIRE's damages expert, CPA Jared Jordan, testified at pages 14, 497 to 501 of the record that he looked at WIC FIRE's financial statements, profit and loss statements, tax records, Google data, other data from WIC FIRE and TriMax, and what he termed Google geographic performance data. Using that data, and in addition relying on representations from the executives and founders of the company, Chet Hall and John Brown, relying on the testimony of Chet Hall and For interference with prospective business relations, what he did was look at the delay that WIC FIRE experienced from the launch of their coupon.co platform that resulted from the actions that were the basis of liability in this case. There was testimony and evidence that the coupon.co was delayed by six months. What the damages expert, Jordan, looked at was the ultimate, the profitability of WIC FIRE before and the relationships that WIC FIRE was leveraging in its direct advertising channel, then the ultimate profitability and revenue stream from the coupon.co that eventually launched six months late. He looked at the campaigns that were being generated and these ad campaigns, which both sides used as the basis for their damage models, are the lifeblood of these companies in the affiliate marketing space. He determined based on that that WIC FIRE suffered $334,000 in damages for the prospective business relations. For the existing contract damages, those damages are based on what we've been talking about with respect to Lanham Act, what we've called the impersonating ads or the phony ads. You got a verdict under Texas law for interference of contract and you said the measure has lost profits. So what's your evidence of lost profits under Texas law?  Yes, I understood, Your Honor. In the evidence of lost profits, it correlates with lost campaigns. Witnesses for both sides, Mr. Hall, Ms. Woodruff, the head of Trimax, both testified as to how campaigns correlate with profits. And Mr. Jordan analyzed lost campaigns and average profitability per ad campaign and extrapolated that profitability per ad campaign into lost profits. That is what both sides' damages experts did. In fact, their ---- I misunderstood that. I thought that for the interference with the existing contracts, the measure of damages was the time, the value of the time that two individuals or one individual spent litigating this lawsuit, dealing with all of the facts of the lawsuit. So perhaps I can attempt to clarify for you. Ultimately, damages in this case in lost profits comes down to the advertising campaigns. But the time that was spent due to business interruption, due to the activities of the appellants, also underlies damages for the following reason. It was those activities ---- This is a small company essentially run by two people. It was those activities that caused them to divert resources from trying to generate new campaigns, from launching this new platform, which ultimately was immediately profitable and successful for the company. So the reason why the campaigns were lost is this diverted energy. But the actual lost profits calculation is based on a combination of what campaigns were gained and lost, as well as an inquiry into ---- Where is the evidence? Where can we go and see the numeric evidence of this campaign and translate specific campaigns that were lost and how those dollars were calculated? The evidence in this regard is in Jared Jordan's testimony, starting at, I believe, page 14496 of the record. The crux of the appellant's argument on damages on appeal is that there are not in the record tax returns and other financial statements from WIC fire. Texas law is clear, for example, ERIB Swinea from 2010, that the actual presence in the record of the supporting documentation is not relevant, is not necessary to support an award. The actual supporting documentation goes to weight, not admissibility and validity. Is there a place in the record that we can go and an expert has said in something other than conclusory fashion, here are the campaigns that were lost and I calculated dollar amounts to go with each of these campaigns? The best I can point you to, Your Honor, is Mr. Jordan's testimony, which, as I said, starts at 14496 or 97. I think it's also relevant that their damages expert, Brent Burson, also testified about the value for each individual campaign. On their end, they adopted the exact same methodology and also endorsed the notion that individual campaigns have profit and loss value associated with them. So I will point you to Mr. Jordan's testimony, Mr. Burson's testimony, and also Mr. Hall, my client's CEO, although he didn't go into the nitty-gritty dollars and cents of it, did certainly testify not in terms of the amount of harm, but in terms of the fact of harm. That fact is fine, but you've got to quantify that and you've got to have evidence to quantify that. And I'm asking you, I need to know what the evidence was that says this campaign, we lost it and we get to a dollar amount this way. And I don't see that in your briefing. And in that calculation of how much dollar amount was attributable to each campaign? You said loss of campaigns is the measure. So you've got to have some valid methodology for putting a dollar amount on each loss campaigns or globally that's tied to something that's tangible, not just guesswork. And the way that Mr. Jordan performed that analysis was he did a yardstick method of before and after. He looked at before the misconduct occurred, how much profit WIC Fire was yielding on a per-campaign basis. Then he looked at the effect of the misconduct on the number of campaigns generated. So after finding the dollars per campaign and then the effect on the campaigns generated, he was able to calculate a damages figure by applying that dollars per campaign figure to the campaigns affected by the misconduct. That's reflected in his testimony at 14496. It's on one page? Oh, I'm sorry. It's for, the testimony starts at 14496 and continues through 14496. I think in relevant, the entire testimony is 10 to 12 pages in the record, but the relevant part I think continues through 14502. Are there any other questions about the damages calculation? I would like to speak briefly about waiver. I think that we do raise the issue of waiver. And as Your Honor will see, at the close of evidence, they did move under Rule 50A. It was very conclusive. What they said is we move under tortious interference with existing contracts under all the elements and also interference with prospective contracts. They did not renew that motion at the close of evidence. And they did not explain at all what they were actually challenging. And this case is unique and important in this regard because as this court recognized in the Quinn case, what a party can't do is not squarely contest an issue, gamble on the jury verdict, and then come back and argue about it later. And that's exactly what they did. They agreed on the proper way to calculate damages in this industry. They sponsored an expert who did the exact same thing. Their expert said that he did the exact same thing. The judge surely did question the damages analysis. The judge practically begged appellants to make a motion on damages under Rule 50A. But they didn't. And frankly, Your Honor, it's the same reason we didn't. It's because we both sponsored the same damages analysis. And they knew that if they were successful in eliminating our damages, it would eliminate theirs. And we had a $2.5 million damages model. They had a $20 million counterclaim. And they wanted to gamble to the jury on this claim. The primary basis that the district judge and their brief point to why the purpose, if not the letter, of Rule 50A and 50B were satisfied is the district court questioned the damages analysis. I will say only that the district court questioned the analysis primarily after police put on their case, before appellants put on their case. Before additional evidence was heard from their damages expert of our extensive cross-examination of their CEO. And they didn't, in light of the court's invitation, actually take him up and challenge damages squarely. The Flint Co. case is very clear that the court's statements don't suffice under Rule 50A. And there's good reason for that. The parties are entitled to know what's actually in dispute. What the other party is going to challenge. Not a sua sponte challenge from the judge. And mind you, of course, the judge was ultimately persuaded. He entered judgment on this claim in damages. So whatever he said on the record during trial, he entered judgment. Under Flint Co., his statements don't get them across the line. In this case, there was no notice that our damages model was disputed because they adopted the exact same model. I'll say briefly that their best case on this issue is the Logan case. It's the case that the district court cited. The difference between our case and the Logan case is, of course, that not only did, in this case, they make an extremely conclusory 50A motion, but after the district court had put them on notice that their very same damages model was at risk, they sponsored an identical model. That's waiver under the rules. Now, just turning briefly to the other tort claims, just so that your honors understand the theory of this case. This affiliate marketing space is a unique industry, but it's been around for a while. Appellants tout in their brief that their company and their leaders had managed their company profitably for 15-plus years using the exact same business model we did, provision of online affiliate marketing services. So this is not a case like the Texas Instruments v. Teletron case where there's some new and untested product where it's impossible to forecast out what the damages might be. This, while it's an online industry, is an established industry. The business model, frankly, is very straightforward in this pay-per-click online advertising industry. Profits have been established by our company even in a short period. I would submit that the damages in our case, in the theory in our case, are most similar to two cases. One is the Hamoki case, which we cited extensively in the brief. The other case that I would point your honor to is the Amigo Broadcasting case.  Amigo Broadcasting involved a broadcasting company that was only 20 months old. Wickfire was relatively young, although not quite that young. Amigo Broadcasting put on its damages with evidence that they expected their programming and ratings to grow by 16%, very similar to the evidence that we presented with regard to the expected growth of advertising campaigns. What the Amigo court held was that just because this was a new company, they could prove profits because it was an established industry. They also held that ratings could be analogous to profits, the same way that campaigns are analogous to profits here. The notion mentioned by appellants that we haven't proved any contract that was interfered with is simply wrong. While Wickfire and Trimax do have thousands of underlying merchants for whom they place advertisements, this industry, like others, involves an intermediary contract or a few intermediary contracts. These large contracts, commission junction, share sale, et cetera, are in the record. Specific terms and conditions of those contracts are in the record, and it was those terms and conditions, the terms and conditions that bar companies from placing certain keywords in their advertisements that Trimax and Laura Woodruff attacked with their impersonating ads. This fits squarely in the doctrine of intentional interference or tortious interference. It fits squarely under the rubric of Hamoki. There are contracts at issue they were interfered with. I agree with the panel that the most substantial issue on this appeal is damages, but we submit that that issue was waived, that both parties sponsored the same damages model. They, who tout they've been in this industry for 20 years, agreed that this was the proper way to measure damages. In all of the cases they cite, Great Pines, Holt, Texas Instruments, Steluti, Phillips, Horizon, in all of those, the issue was that there was no consideration of objective facts, figures, and data. Here, our expert considered financial statements, tax returns, P&Ls, Google data, internal data, et cetera. That suffices under the law. Thank you, Your Honor. Our damages were very different from WIC fires. For example, we didn't claim loss of energy, which was their primary focus for their damages. The newness of their company and the objective, lack of objective facts and figures combined defeat any of their claims for damages. We also put on a witness who testified, an actual merchant that we had done business with, who testified what the value and how much she had paid us for a year, for example, for an advertising campaign. They put on no intermediaries or clients whatsoever, and the contracts that they claim they introduced into evidence, the intermediary contracts, are not the contracts that were lost, according to them. According to them, it was Blumex that gave them a termination notice, and that was an end merchant, not an intermediary contract, and Blumex still worked for them. We addressed all the waiver arguments in our brief. I didn't hear anything new there that I need to address for the court, unless it has a question on that. If this case doesn't fall on subject matter jurisdiction, then it must fall on damages. They had no evidence of any profits at all. Judge Owen, as you mentioned, there are no actual documents or data in the record other than their experts' conclusory assertions of this few-month-old business, and the coupon company thing they did was entirely new and was speculative. It was based on a new algorithm they created after they tested the WebCrawler trademark site and used it to run up Trimax's expenses through the roof for six weeks, which they admitted wasn't even necessary, but they did it anyway. Did they have data after they got Coupon Co., whatever it is, going of what it made once it finally began? Not actual data. Only the experts' conclusory opinions. There were no evidence of actual profits. There are no financial statements, no any kind of profit and loss statements, anything like that that would be substantive evidence. It was only the experts' opinions. We distinguish Berkshire Brothers in footnote 9 of one of our briefs. There the court did not have original jurisdiction in the first instance, or here the court didn't, and Berkshire Brothers, they did, so it was discretionary as to whether to hold on to the claims. Even assuming arguendo that the court doesn't vacate for lack of subject matter jurisdiction for any reason, WIC FIRE's Lanham Act claim was deficient on every single element as a matter of law, and we would ask the court to reverse the Lanham Act claim on the liability finding because it will matter on remand with respect to attorney's fees and perhaps some other aspect of the case. This case is very different than Hamoki because in our case, or in Hamoki, their tax returns were entered into evidence. It was a 16-year-old business. They produced evidence of lost profits on existing contracts. Here there's no specific contract identified with respect to any terms that they would have been paid for anything. There are no income tax returns, any kind of financial documents, or even timesheets, and they admit, their expert admitted that he did not even deduct time when he was counting those 2,000 hours that they spent helping assist with the trial or preparing for trial or tending to other companies' click fraud complaints or the time they spent with anything other than TRIMAX, and there was a substantial amount of time devoted to that. WIC FIRE was in business for less than a year when it filed this lawsuit, and the law is rightly suspicious of untried enterprises, particularly when there is no actual evidence of financial information on which the court could evaluate damages. We ask the court first to hold that it does not have subject matter jurisdiction so as to not expand the law of trademark or federal jurisdiction and the alternative to reverse and render in favor of TRIMAX on all claims. Thank you. Thank you. Thank you, counsel. The case is argued today. It will be taken under advisement. This panel will adjourn until 9 a.m. tomorrow morning.